**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| TOMMY RAY WILLIAMS,<br><br>　　　　　Petitioner,<br><br>　　v.<br><br>MIKE KNOWLES, Warden,<br><br>　　　　　Respondent. | ) Case No.: 1:03-cv-05819-JLT<br>)<br>) ORDER ON REMAND DENYING PETITION FOR<br>) WRIT OF HABEAS CORPUS WITH PREJUDICE<br>) (Doc. 1)<br>)<br>) ORDER DIRECTING CLERK OF THE COURT TO<br>) ENTER JUDGMENT AND CLOSE THE CASE<br>)<br>) ORDER DECLINING TO ISSUE CERTIFICATE<br>) OF APPEALABILITY |

　　　　In 1988, Petitioner pleaded guilty to second degree murder and driving under the influence causing injury. The court sentenced him to indeterminate 15-year-to-life sentence for the second degree murder conviction plus a determinate three-year concurrent term for the other charge. In this action, Petitioner asserts that his trial counsel pressured him into accepting the plea deal, that newly discovered evidence indicates that he did not cause the death of the victim, that the trial court erred in failing to investigate trial counsel's ineffectiveness and that the trial court erred in failing to assess his ability to pay before imposing restitution. For the reasons set forth below, the petition is **DENIED**.

**I.　　Procedural History**

**　　A.　　State Court Proceedings**

　　　　On October 23, 1998, the Superior Court of the State of California, County of Tuolumne found Petitioner guilty of second degree murder (Cal. Pen. Code §187(a)), and driving under the influence causing injury (Cal. Veh. Code § 23153(a)). (Doc. 8, Exh. A) The court imposed an indeterminate 15-

year-to-life sentence for the second degree murder conviction plus a determinate, three-year concurrent term for driving under the influence resulting in injury.  (Id.).  Petitioner attempts to set aside the plea and/or to appeal his conviction failed.[1]

On May 9, 2002, Petitioner filed a petition for writ of habeas corpus in the Tuolumne County Superior Court.  (Doc. 8, Exh. B).  He asserted: (1) ineffective assistance of trial counsel in that counsel, fearing for her own safety and intimidation resulting from the local publicity, pressured Petitioner to accept a guilty plea rather than go to trial; (2) newly discovered evidence, i.e., the autopsy report which indicates that peritonitis resulting from an improperly placed feeding tube, caused the victim's death; (3) failure of the trial court to inquire into defense counsel's ineffectiveness once it was advised of threats made against counsel and Petitioner; and (4) error by the trial court in imposing a restitution fine without conducting a hearing on Petitioner's ability to pay.  (Doc. 8, Exh. B). The Superior Court denied the petition as untimely and on the merits of the ineffective assistance of counsel claim.  (Id., Exh. C)  The superior court did not expressly address the remaining claims in the petition.

Petitioner then filed a habeas petition in the 5th DCA, raising the same issues as in the previous petition.  (Doc. 8, Exh. D). The 5th DCA summarily denied the petition.  (Id., Exh. E).   Petitioner filed a third petition for writ of habeas corpus in the California Supreme Court and raised the same issues as in the previous two petitions.  (Id., Exh. F). The Court denied the last petition without.  (Id., Exh. G).

**B.     Federal Court Proceedings**

Petitioner filed his initial federal petition in this Court on June 16, 2003.  (Doc. 1).  Petitioner attached the same legal briefs and arguments Petitioner raised in each of his state court habeas petitions. (Id.).  In response, Respondent moved to dismiss the petition because it was submitted beyond the one-year statute of limitations.  (Doc. 8).  Petitioner opposed the motion.  (Doc. 9).

The Court granted the motion to dismiss.  (Docs. 11, 12).  Petitioner appealed and the Court of

---

[1] The parties have disputed whether Petitioner timely appealed his conviction. On December 17, 1998, Petitioner signed two requests to withdraw his guilty plea, one in the Court of Appeal, Fifth Appellate District ("5[th] DCA") and one in the Tuolomne County Superior Court. (Doc. 38, Exh. B). Prison mail records logged these two documents on December 23, 1998. (Doc. 38, Exh. C). It is undisputed that the Superior Court received the document on December 28, 1998, and lodged it but did not file it. (Doc. 38, Exh. D). Though the Superior Court apparently construed the document as a notice of appeal, it notified Petitioner that his filing was deemed late since it was received beyond the sixty-day period for filing a notice of appeal. (Id.). On March 24, 1999, the 5th DCA issued an order denying the motion for acceptance of appeal, indicating that the appeal had been received beyond the sixty-day period and that Petitioner had waived his right to appeal because of his change of plea. (Doc. 38, Exh. E).

1   Appeals for the Ninth Circuit vacated the judgment.  On remand, the Court required "further factual

2   development, and if determined appropriate by the district court, an evidentiary hearing, to determine

3   (1) whether petitioner satisfied the actual innocence test set forth in <u>Schlup v. Delo</u>, 513 U.S. 298

4   (1995); (2) whether the statute of limitations began to run on August 30, 2001, the date petitioner

5   discovered the factual predicate for his claims; and (3) whether the statute of limitations should be

6   equitably tolled until August 30, 2001."  (Doc.  23).

7       Soon thereafter, Respondent filed a renewed motion to dismiss, again based upon the violation

8   of the one-year statute of limitations.  (Doc. 28).  In this second motion, Respondent addressed only

9   "actual innocence" under <u>Schlup</u>, and tolling for newly discovered evidence under § 2244(d)(1)(d);

10  Respondent did not address the issue of equitable tolling.  (Doc. 28, pp. 5-9).  Petitioner opposed the

11  motion and filed a declaration from Petitioner, prison mail logs, and the case log of trial counsel.  (Doc.

12  37).

13      This time, the Court denied the motion to dismiss based upon the Court's conclusion that the

14  record did not establish that trial counsel <u>expressly</u> told Petitioner of the contents of the autopsy report,

15  e.g., that the improper insertion of the feeding tube was the cause of the victim's death.  (Doc. 40).  The

16  Court concluded Petitioner did not discover the factual basis for his claim of ineffective assistance until

17  counsel gave the actual autopsy report to him.  (<u>Id</u>.).  Due to significant delay in transmitting the

18  autopsy report and other considerations, the Court concluded the petition was timely.  (<u>Id</u>.).

19      Respondent filed a motion for reconsideration, arguing that the Court's interpretation of trial

20  counsel's statement that she had "shared" the contends of the autopsy report with Petitioner was at

21  variance with what trial counsel had intended to say, and that Petitioner's version of events was "a lie."

22  (Doc. 41, p. 5).  The Court denied the motion for reconsideration, concluding that Respondent's

23  "evidence" regarding trial counsel's intentions was not new and that Respondent failed to provide the

24  Court with specific probative evidence regarding precisely what trial counsel told Petitioner prior to the

25  entry of his guilty plea.  (<u>Id</u>.). Thereafter, Respondent filed an answer to the merits of Petitioner's

26  ineffective assistance of counsel claim, but also contended, that the petition was untimely pursuant to

27  28 U.S.C. § 2244(d)(1).  (Doc. 45).  Petitioner filed a Traverse in which he responded both to the

28  timeliness issue and to the merits.  (Doc. 48).

1    The Court scheduled an evidentiary on the issue of whether trial counsel was ineffective in

2    "failing to advise [Petitioner] of the contents and legal significance of the autopsy report prior to his

3    guilty plea." (Doc. 51, p. 8).  The Court indicated that, because of the absence of specific expert

4    testimony, it was "not in a position to determine whether the hospital's actions were grossly negligent

5    under the circumstances and, hence, whether Petitioner would have likely succeeded at trial by

6    asserting a lack of causation defense." (Id.).  The Court held the evidentiary hearing on April 29, 2009,

7    at which Petitioner and his trial counsel, Karen Block-Davis, testified.  (Doc. 57).

8    After additional briefing, the Court granted the motion to dismiss.  (Doc. 78).  The Court

9    concluded that, while it had insufficient evidence to determine whether the hospital's conduct

10   constituted gross negligence such to constitute an intervening legal cause of the victim's death, the

11   Court found that Petitioner had discovered the "factual basis" of his claim prior to entering his plea.

12   Thus, the Court concluded the petition was untimely.

13   Petitioner appealed once again.  (Doc. 80).  The Ninth Circuit affirmed the Court's

14   determination that Petitioner knew the factual basis of his claim prior to entry of plea, thus making the

15   petition untimely under the AEDPA.  (Doc. 89).  However, the Ninth Circuit noted that during the

16   pendency of the appeal, the United States Supreme Court held that actual innocence could constitute a

17   basis for avoiding the bar of the AEDPA's one-year limitation.  McQuiggin v. Perkins, 569 U.S.___,

18   133 S.Ct. 1925 (2013).  Accordingly, the Ninth Circuit remanded the case "for a determination of

19   whether [Petitioner's] actual innocence claim meets the standard set forth in McQuiggin so that he is

20   entitled to an exception to the expiration of the AEDPA statute of limitations." (Doc. 89, pp. 2-3).

21   In response to the remand, the Court ordered the parties to brief the issue.  After reviewing the

22   filings, the Court ordered the parties to file briefs addressing whether an evidentiary hearing was

23   warranted regarding the issue of the hospital's purported gross negligence in causing the victim's death.

24   (Doc. 96).  The parties subsequently filed such briefs (Docs. 97, 98), and, on March 6, 2015, the Court

25   set an evidentiary hearing.  (Doc. 99; Doc. 107).

26   Before the evidentiary hearing, however, Respondent filed a request to withdraw the motion to

27   dismiss.  (Doc. 108).  Despite Petitioner's opposition to the request, the Court granted Respondent's

28   request to withdraw the affirmative defense of untimeliness and vacated the evidentiary hearing given it

4

no longer addressed any issue raised in the petition.  (Doc. 111).  By that same order, the Court set a schedule for further briefing on the merits of the petition.  (Id.).  As ordered by the Court, the parties then filed opening briefs on the merits (Docs. 114, 115), and, later, filed reply briefs.  (Docs. 117, 118). Thus, almost fifteen years after Petitioner filed his original petition, the petition is now ready for a review of the merits of Petitioner's claims.

## II.    Discussion

### A.    Jurisdiction

Relief by way of a petition for writ of habeas corpus extends to a person in custody pursuant to the judgment of a state court if the custody is in violation of the Constitution, laws, or treaties of the United States.  28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); Williams v. Taylor, 529 U.S. 362, 375 n. 7 (2000).  Petitioner asserts that he suffered violations of his rights as guaranteed by the United States Constitution.  The challenged conviction arises out of the Tuolomne County Superior Court, which is located within the jurisdiction of this court.  28 U.S.C. § 2254(a); 28 U.S.C.§ 2241(d).

On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its enactment.  Lindh v. Murphy, 521 U.S. 320 (1997), cert. denied, 522 U.S. 1008, 118 S.Ct. 586 (1997); Jeffries v. Wood, 114 F.3d 1484, 1500 (9th Cir. 1997), cert. denied, 520 U.S. 1107 (1997), overruled on other grounds by Lindh v. Murphy, 521 U.S. 320 (holding the AEDPA only applicable to cases filed after statute's enactment).  The instant petition was filed after the enactment of the AEDPA and is therefore governed by its provisions.

### B.    Legal Standard of Review

A petition for writ of habeas corpus under 28 U.S.C. § 2254(d) will not be granted unless the petitioner can show that the state court's adjudication of his claim: (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that "was based on an unreasonable determination of  the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d); Lockyer v. Andrade, 538 U.S. 63, 70-71 (2003); Williams, 529 U.S. at 412-413.

A state court decision is "contrary to" clearly established federal law "if it applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases, or "if it confronts a set of facts that is materially indistinguishable from a [Supreme Court] decision but reaches a different result." Brown v. Payton, 544 U.S. 133, 141 (2005), citing Williams, 529 U.S. at 405-406 (2000).

In Harrington v. Richter, 562 U.S. ___ , 131 S.Ct. 770 (2011), the U.S. Supreme Court explained that an "unreasonable application" of federal law is an objective test that turns on "whether it is possible that fairminded jurists could disagree" that the state court decision meets the standards set forth in the AEDPA. The Supreme Court has "said time and again that 'an *unreasonable* application of federal law is different from an *incorrect* application of federal law.'" Cullen v. Pinholster, 131 S.Ct. 1388, 1410-1411 (2011).  Thus, a state prisoner seeking a writ of habeas corpus from a federal court "must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility of fairminded disagreement."  Harrington, 131 S.Ct. at 787-788.

The second prong pertains to state court decisions based on factual findings.  Davis v. Woodford, 384 F.3d at 637, citing Miller-El v. Cockrell, 537 U.S. 322 (2003).  Under § 2254(d)(2), a federal court may grant habeas relief if a state court's adjudication of the petitioner's claims "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  Wiggins v. Smith, 539 U.S. at 520; Jeffries v. Wood, 114 F.3d at 1500.  A state court's factual finding is unreasonable when it is "so clearly incorrect that it would not be debatable among reasonable jurists."  Id.; see Taylor v. Maddox, 366 F.3d 992, 999-1001 (9th Cir. 2004), cert.denied, Maddox v. Taylor, 543 U.S. 1038 (2004).

To determine whether habeas relief is available under § 2254(d), the federal court looks to the last reasoned state court decision as the basis of the state court's decision.  See Ylst v. Nunnemaker, 501 U.S. 979, 803 (1991); Robinson v. Ignacio, 360 F.3d 1044, 1055 (9th Cir. 2004).  "[A]lthough we independently review the record, we still defer to the state court's ultimate decisions."  Pirtle v. Morgan, 313 F.3d 1160, 1167 (9th Cir. 2002).

The prejudicial impact of any constitutional error is assessed by asking whether the error had "a substantial and injurious effect or influence in determining the jury's verdict."  Brecht v. Abrahamson,

507 U.S. 619, 623 (1993); see also Fry v. Pliler, 551 U.S. 112, 119-120 (2007)(holding that the Brecht standard applies whether or not the state court recognized the error and reviewed it for harmlessness). Furthermore, where a habeas petition governed by the AEDPA alleges ineffective assistance of counsel under Strickland v. Washington, 466 U.S. 668 (1984), the Strickland prejudice standard is applied and courts do not engage in a separate analysis applying the Brecht standard.  Avila v. Galaza, 297 F.3d 911, 918 n. 7 (9th Cir. 2002);  Musladin v. Lamarque, 555 F.3d 830, 835 (9th Cir. 2009).

## III.    Review of Petitioner's Claims

Petitioner alleges: (1) ineffective assistance of trial counsel; (2) failure of the trial court to conduct an inquiry into defense counsel's alleged conflict of interest; and (3) the trial court erred in imposing a restitution fine.[2]

### A.    Ineffective Assistance of Trial Counsel

Petitioner contends that his trial counsel provided him ineffective assistance because she failed to conduct an adequate investigation into the alleged gross negligence in inserting the victim's feeding tube before advising Petitioner regarding his guilty plea.  Petitioner also contends that counsel had a conflict of interest because of threats made against her and Petitioner.

### 1.    The State Court Decision and Standard of Review

The 5th DCA rejected Petitioner's notice of appeal as untimely and the Superior Court summarily rejected Petitioner's habeas corpus petition, also as untimely.  Both the Court of Appeal and the California Supreme Court summarily denied Petitioner's habeas petitions without comment. Accordingly, pursuant to the "look through" doctrine of Ylst v. Nunnemaker, 501 U.S. 797 (1991), the Court looks to the last reasoned decision. In this case, that is the order of the Superior Court denying Petitioner's first state habeas petition.

Respondent argues that the Superior Court's order addressed the petition's untimeliness and it's

---

[2] The petition also claims "newly discovered evidence." (Doc. 1).  However, Petitioner does not cite, and the Court is unaware of, any authority for the proposition that newly discovered evidence can be considered a cognizable "stand alone" claim.  Moreover, both the state court and this Court, following an evidentiary hearing, have concluded that the evidence is not "newly discovered," but instead was available to both Petitioner and his defense attorney prior to entry of the guilty plea.  Although Petitioner continues to assert that this is not true, and that he did not know of the information contained in the newly discovered evidence until several years after his conviction, all of the persuasive evidence supports both the state and federal courts' findings.  As discussed elsewhere in this order, this Court is bound by the state court's findings unless they are objectively unreasonable.  28 U.S.C. § 2254(d)(2).  Additionally, as discussed infra, this Court is bound by the findings at the evidentiary hearing, which constitute law of the case.  Accordingly, the Court will not address this "claim" in the body of this order.

1   merits.  (Doc. 114, pp. 2-3).  Since the Court's assessment of this argument affects the degree of

2   deference to be accorded to the state court, the Court will first address this preliminary issue.

3         Following Harrington v. Richter, 562 U.A. 86, 98-99 (2011), the Ninth Circuit has held that a

4   "presumption of a merits determination [exists] when it is unclear whether a decision appearing to rest

5   on federal grounds was decided on another basis."  Runningeagle v. Ryan, 688 F.3d 758 (9th Cir. 2012);

6   see Harris v. Reed, 489 U.S. 255, 265 (1989).

7         Here, the Superior Court's order denying the first state petition ruled in part as follows:

8         A review of the file and of course the context of the Petitioner's own Writ reveals that the
          alleged recently discovered evidence concerning the actual cause of death of the victim was in
9         fact not newly discovered and was thoroughly made available to the defendant and defendant's
          attorney prior to his entry into a negotiated plea.

10        The petitioner failed to raise his claims in a timely fashion.  He does not show that his delay
11        was justified by recent discovery of a new legal or factual basis in support of his claim or that
          his claim falls within an exception to the time limits bar.  Accordingly, the petition is denied.

12

13   (LD 2, Ex. C).

14         The first paragraph quoted above refers to the substantive claim of newly discovered evidence

15   and rejects this claim on its merits.  This determination undercuts Petitioner's claims to the extent the

16   Superior Court found that counsel was not ineffective for allowing the plea to be entered without

17   sufficient investigation and that the plea was voluntary because Petitioner was aware of the evidence of

18   the hospital's potentially gross negligence.  Thus, language of the decision is persuasive evidence that

19   the Superior Court denied the petition on its merits and, as an alternative basis, denied it on

20   untimeliness.[3]

21         Notably, it is Petitioner's burden to affirmatively rebut this presumption by showing that the

22   state court ruling was not on the merits; he has not done so.  Indeed, it does not appear that Petitioner

23   addressed this issue in any of his filings in this Court.  Accordingly, because Petitioner has not

24   demonstrated that the state court decision was not on the merits, and because it appears to this Court

25

26   _____

27   [3] Respondent did not raise procedural default (timeliness) as an affirmative defense in the Answer.  (Doc. 45).  Normally,
     the answer in a federal habeas case must identify whether any claim in the petition is barred by a defense such as procedural
     default.  Rule 5(b) of the Rules Governing Section 2254 Cases in the United States District Courts. The government in a
28   2254 case waives an affirmative defense by filing a responsive pleading that fails to affirmatively set forth the defense.  See
     Day v. McDonough, 547 U.S. 198, 126 S.Ct. 1675 (2006). As mentioned, Respondent has never argued the state procedural
     bar of timeliness; accordingly, Respondent has waived the defense and the Court will not consider it in these proceedings.

that the state adjudication was a merits adjudication as well as a procedural bar, in the alternative, the Court will review Petitioner's ineffective assistance claim with the § 2254 deference required by the AEDPA. Runningeagle, at 688 F. 3d at 769.

However, the Court will also review the ineffective assistance claim de novo.  In this review, the Court will not afford the determination § 2254(d) deference.  This is required when there is no "merits adjudication" of the claim.  Pirtle v. Morgan, 313 F.3d 1160, 1167-1168 (9th Cir. 2002).  In such cases, the federal habeas court must review the claim de novo.  Nulph v. Cook, 333 F.3d 1052, 1056 (9th Cir. 2003); Pirtle, 313 F.3d at 1167. As explained below, under either standard, the petition must be **DENIED**.

## 2.    Federal Law re: Ineffective Assistance of Counsel

Effective assistance of counsel is guaranteed by the Due Process Clause of the Fourteenth Amendment. Evitts v. Lucey, 469 U.S. 387, 391-405 (1985). Courts review claims of ineffective assistance of counsel according to Strickland's two-pronged test. Miller v. Keeney, 882 F.2d 1428, 1433 (9th Cir.1989); United States v. Birtle, 792 F.2d 846, 847 (9th Cir.1986).

To prevail, Petitioner must show two things. He must establish that counsel's deficient performance fell below an objective standard of reasonableness under prevailing professional norms. Strickland v. Washington, 466 U.S. 668, 687-88 (1984). He must establish also that he suffered prejudice in that there was a reasonable probability that, but for counsel's unprofessional errors, he would have prevailed on appeal. Id. at 694. A "reasonable probability" is a probability sufficient to undermine confidence in the outcome of the trial. Id. The relevant inquiry is not what counsel could have done; rather, it is whether the choices made by counsel were reasonable. Babbitt v. Calderon, 151 F.3d 1170, 1173 (9th Cir.1998).  The Strickland test applies to challenges to guilty pleas based on ineffective assistance.  Hill v. Lockhart, 474 U.S. 52 (1985).

With the passage of the AEDPA, habeas relief may only be granted if the state-court decision unreasonably applied this general Strickland standard for ineffective assistance.  Knowles v. Mirzayance, 556 U.S. ___, 129 S.Ct. 1411, 1419 (2009).  Accordingly, the question "is not whether a federal court believes the state court's determination under the Strickland standard "was incorrect but whether that determination was unreasonable–a substantially higher threshold." Schriro v. Landrigan,

550 U.S. 465, 473 (2007); <u>Knowles v. Mirzayance</u>, 556 U.S. ___, 129 S.Ct. at 1420.  In effect, the AEDPA standard is "doubly deferential" because it requires a petitioner to show not only that the state court determination was erroneous, but also that it was objectively unreasonable.  <u>Yarborough v. Gentry</u>, 540 U.S. 1, 5 (2003). Moreover, because <u>Strickland</u> constitutes a general standard, a state court has even more latitude to reasonably determine that a defendant has not satisfied that standard.  <u>See Yarborough v. Alvarado</u>, 541 U.S. 652, 664 (2004)("[E]valuating whether a rule application was unreasonable requires considering the rule's specificity.  The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations").

### 3.    Analysis

#### a.    Deference

AEDPA requires that this Court review state court adjudications on the merits under an "objectively unreasonable" standard, a very difficult standard to meet.  <u>Wiggins v. Smith</u>, 539 U.S. at 511.  However, even under de novo review, i.e., without AEDPA's usual § 2254 deference, the Court is otherwise constrained by additional considerations and principles.  First, to the extent that Petitioner's claim rests upon facts educed at the evidentiary hearing and found in the Court's order, the Court is bound by those findings as law of the case.[4] Additionally, the Court's findings regarding what Petitioner and his counsel knew and when they knew it, were affirmed on review by the Ninth Circuit.  Thus, these findings are doubly binding here.

Second, the Court must give <u>Strickland</u> deference to trial counsel's experience, expertise, and first-hand perspective in advising Petitioner during the plea bargaining phase. In <u>Premo v. Moore</u>, 562 U.S. 115 (2011), the Supreme Court explained:

> Acknowledging guilt and accepting responsibility by an early plea respond to certain basic premises in the law and its function.  Those principles are eroded if a guilty plea is too easily set aside based on facts and circumstances not apparent to a competent attorney when actions

---

[4] To promote finality, the "law of the case" doctrine holds that "the decision of an appellate court on a legal issue must be followed in all subsequent proceedings in the same case."  <u>United States v. Cole</u>, 51 F.3d 178, 181 (9th Cir. 1995).  The doctrine acts as a bar only to issues that were "actually considered and decided by the first court." Id.  Similar to the concept of res judicata, which bars re-litigation of a claim previously litigated in another suit, "law of the case" doctrine ensures finality of legal issues decided in an earlier proceeding in the same case.  See <u>Arizona v. California</u>, 460 U.S. 605, 619 (1983); <u>Rezzonico v. H.&R. Block, Inc.</u>, 182 F.3d 144, 148 (2d Cir. 1999)("The doctrine of law of the case is similar to the issue preclusion prong of res judicata in that it limits re-litigation of an issue once it has been decided.  However, law of the case is concerned with the extent to which law applied in a decision at one stage of litigation becomes the governing principle in later stages of the same litigation.").

and advice leading to the plea took place.  Plea bargains are the result of complex negotiations suffused with uncertainty, and defense attorneys must make careful strategic choices in balancing opportunities and risks.  The opportunities, of course, include pleading to a lesser charge and obtaining a lesser sentence, as compared with what might be the outcome not only at trial but also from a later plea offer if the case grows stronger and prosecutors find stiffened resolve.  A risk, in addition to the obvious one of losing the chance for a defense verdict, is that an early plea bargain might come before the prosecution finds its case is getting weaker, not stronger.  The State's case can begin to fall apart as stories change, witnesses become unavailable, and new suspects are identified.

These considerations make strict adherence to the <u>Strickland</u> standard all the more essential when reviewing the choices an attorney made at the plea bargain stage.  Failure to respect the latitude <u>Strickland</u> requires can create at least two problems in the plea context. First, the potential for the distortions and imbalance that can inhere in a hindsight perspective may become all too real.  **The art of negotiation is at least as nuanced as the art of trial advocacy, and it presents questions farther removed from immediate judicial supervision. There are, moreover, special difficulties in evaluating the basis for counsel's judgment: An attorney often has insights borne of past dealings with the same prosecutor or court, and the record at the pretrial stage is never as full as it is after a trial. In determining how searching and exacting their review must be, habeas courts must respect their limited role in determining whether there was manifest deficiency in light of information then available to counsel.** <u>Lockhart v. Fretwell</u>, 506 U.S. 364, 372, 113 S.Ct. 838, 122 L.Ed.2d 180 (1993). AEDPA compounds the imperative of judicial caution.

Second, ineffective-assistance claims that lack necessary foundation may bring instability to the very process the inquiry seeks to protect.  <u>Strickland</u> allows a defendant "to escape rules of waiver and forfeiture," <u>Richter</u>, 562 U.S., at ——, 131 S.Ct. 770.  Prosecutors must have assurance that a plea will not be undone years later because of infidelity to the requirements of AEDPA and the teachings of <u>Strickland</u>. The prospect that a plea deal will afterwards be unraveled when a court second-guesses counsel's decisions while failing to accord the latitude <u>Strickland</u> mandates or disregarding the structure dictated by AEDPA could lead prosecutors to forgo plea bargains that would benefit defendants, a result favorable to no one.

Whether before, during, or after trial, when the Sixth Amendment applies, the formulation of the standard is the same: reasonable competence in representing the accused. <u>Strickland</u>, 466 U.S., at 688, 104 S.Ct. 2052. In applying and defining this standard substantial deference must be accorded to counsel's judgment. <u>Id.</u>, at 689, 104 S.Ct. 2052. But at different stages of the case that deference may be measured in different ways.

In the case of an early plea, neither the prosecution nor the defense may know with much certainty what course the case may take. It follows that each side, of necessity, risks consequences that may arise from contingencies or circumstances yet unperceived. <u>The absence of a developed or an extensive record and the circumstance that neither the prosecution nor the defense case has been well defined create a particular risk that an after-the-fact assessment will run counter to the deference that must be accorded counsel's judgment and perspective when the plea was negotiated, offered, and entered.</u>

<u>Premo v. Moore</u>, 562 U.S. at 124-126.(emphasis supplied).  The following year, the Court further

explained trial counsel's critical role in plea negotiations as follows:

Bargaining is, by its nature, defined to a substantial degree by personal style. The alternative courses and tactics in negotiation are so individual that it may be neither prudent nor practicable to try to elaborate or define detailed standards for the proper discharge of defense counsel's participation in the process.

11

1    <u>Missouri v. Frye</u>, 132 S. Ct. 1399, 1408 (2012).

2          Applying these principles to the instant case, the Court will accord the state court adjudication §

3    2254 deference as a merits decision and determine whether that adjudication was objectively

4    unreasonable.  To the extent that the Court reviews the claim de novo, this Court will be bound by the

5    prior factual findings and will accord defense counsel the appropriate level of deference set forth in

6    <u>Premo</u>.

7                            **b.      The Evidentiary Hearing**

8          At the hearing, trial counsel, Karen Block-Davis, testified that she had been a prosecutor in

9    Ventura County for ten years prior to moving to Tuolomne County, where she worked for four years as

10   a deputy public defendant.  (Doc. 60, p. 51).  Counsel testified that, upon reading the autopsy report's

11   conclusion that the victim died as a result of peritonitis caused by an improperly placed feeding tube,

12   she immediately contacted a friend, a critical care nurse, to discuss the report.  (<u>Id</u>., p. 56).  She testified

13   that "red lights were flashing in [her] mind" and she realized that "he didn't die from the accident, he

14   died from doctor negligence." (<u>Id</u>.).  She asked the nurse how common was it for a feeding tube to be

15   improperly placed and was told "it happens…Nobody's perfect."  (<u>Id</u>., p. 57).

16         Block-Davis then consulted a senior attorney in her office and both agreed that there might be a

17   valid defense based on intervening cause.  Doc. 60, p. 56).  They began to do some limited legal

18   research and were "getting excited" about the fact that Petitioner might actually "have a really good

19   shot at trial." (<u>Id</u>.).  As a result of her research, Block-Davis had "most definitely" concluded the she

20   had a "really triable case."  (Doc. 60, p. 58).  Counsel checked to see if any civil suits were pending

21   against the hospital for negligence or medical malpractice and found there were none.  (<u>Id</u>., p. 57).

22         Block-Davis testified that, although the file notes did not reflect it, she recalled numerous

23   telephone conversations with Petitioner regarding the autopsy report and the causation issue and had

24   instructed her staff that, should Petitioner call her, he should be put through.  (Doc. 60, p. 60).  This was

25   the most serious case that counsel had on her caseload.  (<u>Id</u>.).

26         Counsel also recalled an in-person meeting with Petitioner on September 3, 1998, while he was

27   in the Tuolomne County jail.  (Doc. 60, p. 62).  At that meeting, counsel discussed with Petitioner the

28   prospects for entering a plea.  (<u>Id</u>.).  She told Petitioner that the prosecutor had made an offer that was

"significantly bigger, longer" than she wanted and that she believed the autopsy report had tipped the scales in Petitioner's favor.  (Id.).  She countered the prosecution offer with one of fifteen years to life, based on the fact that the case was no longer a "slam dunk."  (Id.).

At the in-person meeting with Petitioner, counsel showed Petitioner a copy of the autopsy report and then read it to him.  (Doc. 60, p. 63).  She explained to Petitioner that the victim had died because of medical negligence; she also explained the legal significance of the hospital's negligence.  (Id., p. 64).  She told Petitioner that he had a very defendable issue regarding the intervening cause.  (Id., p. 67).  Block-Davis discussed with Petitioner what might happen if they went to trial and what her strategy would be, something she testified she had done on multiple occasions.  (Id., p. 68).

When asked if she had explained the options as being between pleading guilty and going to trial, counsel indicated the following:

> Actually, there were more options than that….It wasn't just a straight you can plead guilty.  There were a variety of charges against him with a huge spectrum of incarceration time.  He had a lot of—he was looking at a lot of time, based on how the District Attorney's Office decided to proceed.  So he was trying to determine what his exposure was.  And so I was trying to narrow down what his exposure was.  Obviously, that's part of my job; that if he chooses to plead guilty, to get him the best deal and that was going to depend on what plea the District Attorney was going to be willing to take.

> So a lot my time was discussing with the District Attorney what they would be willing to take a plea to, what was going to be concurrent time, what was going to be consecutive time, what they were willing to dismiss to get him the best case scenario if he chose to plead guilty.  There were so many…[d]ifferent options that would be within the realm of possibilities.  It wasn't just a cut and dry we can go to trial or you can plead guilty.

(Doc. 60pp. 68-69).

During these conversations, counsel explained to Petitioner that she had filed a motion for change of venue for various reasons including that the victim had been very well known and popular in the community, had been a lifelong resident, had married a hometown girl, and the accident occurred after a softball tournament on the victim's daughter's birthday.  (Doc. 60, p. 69).  She explained that the case was widely reported in the media of this small community and that she had discussed the venue motion with the trial judge, who told her "it would be duly noted for the appeal," but that "there would be no change of venue."  (Id., p. 70).

She also discussed the "sympathy" factor regarding the daughter with Petitioner, i.e., she had undergone multiple surgeries, had pins placed in her leg, that she would undoubtedly testify at trial how

every time she passed through a metal detector the machine "beeped," and that further surgeries were expected.  (Doc. 60, p. 70).  Counsel summarized her thought process as, "[B]asically, I bluntly said to him the juries [sic] going to hate you for causing this accident.  Whether you were the ultimate reason he died or not, you set this in motion." (Id.).

Block-Davis also testified that she explained "jury nullification" to Petitioner and told him that a jury "could have the facts in front of them and have the law in front of them and ignore it and do what they wanted to do."  (Doc. 60, p. 71).  Counsel testified that she had tried over two hundred cases and had learned from experience that there was "no such thing as a sure thing," no "slam dunk."  (Id.).  Throughout this explanation, counsel emphasized to Petitioner that there was a "very triable legal issue."  (Id.).

Counsel also discussed with Petitioner how damaging his record of ten prior DUI convictions would be.  She told him that although she had indicated to the trial judge that she would be filing a pre-trial motion to exclude that from evidence at trial, the judge had indicated that he would admit the evidence and "that the jury would find out about all the priors."  (Doc. 60, p. 72).

Additionally, counsel discussed with Petitioner how he would "present" to the jury, noting that "he had long, stringy hair.  He had maybe 10 teeth in his mouth.  I remember that he was about the same age as my husband, but he looked old enough to be my husband's father."  (Doc. 60, p. 73).  Based on this appearance, and the other circumstances, counsel advised Petitioner that he had no "sympathy factor.  The jury is not going to look at you and like you and want to side with you.  All the sympathy is going to be on the side of the victim and the little girl, and the victim's family."  (Id., p. 73).  Although it was a difficult conversation to have with Petitioner and she felt bad having to explain it to him, she felt "it was important that he understood that even if the facts were on his side, or the law, that a jury would probably disregard it and convict him anyway, especially when they found out about the priors, and the high blood alcohol level."  (Id., p. 73).

Then, as per her usual practice with clients, counsel sent Petitioner a letter outlining his sentencing possibilities.  (Doc. 60, p. 74).  Those options included a best case scenario of guilt only on the DUI with "the enhancements and the injuries," which would have resulted in a sentence of eight years with good time credits earned at 85 percent, to a worst case scenario of being found guilty on all

14

1  counts and facing a sentence of 23 years-to-life.  (Id., pp. 75-76).  Counsel's own proposal to the

2  prosecutor was 15 years-to-life.  (Id.).

3         Block-Davis testified that she always made it "very clear to my clients" that going to trial was

4  their right, but that they needed to acknowledge the risks involved in losing.  (Doc. 60, p. 77).  In

5  Petitioner's case, that included the fact that, if Petitioner were found guilty, the trial judge would face

6  "a tremendous amount of pressure…to give [Petitioner] the maximum that he could."  (Id.).

7         After this discussion, Petitioner indicated that he wanted to "sleep on it."  Petitioner told counsel

8  he wanted her to get him the best deal possible for the least amount of prison time.  (Doc. 60, p. 78).

9  He also told counsel that he had a little girl and that he would rather enter a guilty plea than put the

10 victim's daughter through the ordeal of testifying at trial. (Id.).  Counsel made it "very clear" to

11 Petitioner that he would not be acquitted of the basic DUI charge, but that the "intervening cause"

12 might result in an acquittal on the more serious charges related to the victim's death.  (Id.).

13        When asked why she did not do further legal research on the issue of the intervening cause, she

14 replied as follows:

15        That wasn't the appropriate time at that point.  If we were going to go to trial, I would have
       done that.  If we had gone to a trial-readiness conference, which you can see in the notes it
16     talks about—let me—on 9/25/98 we had a trial-readiness conference.  The jury trial was set for
       October 13th.  It says there's no other cases pending.  Basically the court's telling us there's
17     nothing else on my docket.  I've cleared it.  We're going to go.  And the judge wanted all
       motions, jury questionnaire.  There was going to be a hearing on October 8th, 1998 at 1:30.  He
18     also wanted witness lists, instructions, and verdict forms.

19     That's when I would have gotten into high gear and started preparing for actual trial.  Four
       days later on September 29th, I got a call from the District Attorney that was handling the case,
20     Tim Clancy, and he said that they would take the 15 year offer that we had extended.

21 (Doc. 60, p. 80).

22        Block-Davis made an appointment to go to the jail on the same date and she spoke to Petitioner,

23 told him that the prosecution would accept the 15 year offer, and Petitioner told her he would "sleep on

24 it."  (Doc. 60, p. 81).  During their discussions, counsel told Petitioner that if the matter went to trial,

25 she would retain an expert to testify about the intervening negligence.  However, she indicated she did

26 not feel that obtaining the opinion of medical experts was necessary at the plea bargaining stage

27 because she "knew there'd been negligence on the part of the doctors.  It was right there in the autopsy

28 report, basically."  (Id.).  Also, Petitioner was "very much focused" on getting the best offer from the

15

district attorney and how much time he would have to serve if he pleaded guilty.  (<u>Id</u>.).  She also testified that she had made it clear to him that "even if we had 20 experts that were going to come in and say that there was an intervening cause, that the jury would probably ignore that and convict him anyway."  (<u>Id</u>., p. 82).

On cross-examination by Petitioner's counsel, Block-Davis testified that, at the change of plea hearing, she discussed in camera with the trial judge her desire to place on the record the mitigating circumstances that the hospital's negligence caused the victim's death.  (Doc. 60, pp. 99-100).  However, the trial judge refused to do that and told counsel that, if she did attempt to put that information on the record, "there wasn't going to be a change of plea and we would proceed to trial."  (<u>Id</u>.).  Accordingly, at the change of plea hearing, the factual basis placed in the record included the fact that Petitioner caused the victim's death.  (<u>Id</u>.).

For his part, Petitioner testified that Block-Davis met with him four or five times and *mentioned* the autopsy report but never showed him a copy of it nor did she discuss a possible legal defense with him.  (Doc. 60, pp. 10-12).  Petitioner maintained he first saw the autopsy report approximately two years after sentencing and that Block-Davis never explained to him the cause of the victim's death.  (<u>Id</u>.).  Petitioner concedes that Block-Davis did ask Petitioner if he knew what "peritonitis" was and explained it to him.  He also indicated she had told him that hospital staff had reinserted the tube improperly and that the victim had later died from "complications."  (<u>Id</u>., p. 13).  Petitioner acknowledged that Block-Davis discussed with him the pros and cons of pleading guilty to second degree murder, including the popularity of the victim, Petitioner's prior DUI history, and other factors, and explained that the judge was going to "max" him out.  (<u>Id</u>., pp. 39-40).  However, Petitioner maintained that Block-Davis never explained that any of those circumstances gave rise to a legal defense to the charges.  (<u>Id</u>., p. 13; 39).  Petitioner also testified that counsel never explained to him any reasons why he should go to trial, e.g., based on a defense of intervening cause.  (<u>Id</u>., p. 40).  Finally, Petitioner testified that, had he known of a viable defense, he would have foregone the guilty plea and gone to trial.  (<u>Id</u>., p. 47).

### c.   Discussion

As discussed above, the Court found Block-Davis' testimony to be credible.  This was based at

least in part on the fact that Petitioner had changed parts of his testimony from earlier declarations and court documents regarding what Block-Davis had disclosed to him about the autopsy report.  Implicitly, it seems clear that her testimony appeared to the Court to be more consistent and believable on the whole.  This Court sees no reason nor does it have the grounds to dispute the findings as to the relative credibility of Block-Davis and Petitioner.  Indeed, as discussed above, the Court is bound by those findings as law of the case.

Given the intertwined nature of the facts educed at the evidentiary hearing, it would be difficult, if not impossible, to distinguish between those facts explicitly found by Judge Dixon and those that were implicit in his ruling.  Explicitly, the judge rejected Petitioner's testimony and accepted Block-Davis' testimony as more credible.  He expressly found that Petitioner had been advised before entering his plea regarding the autopsy and the cause of death.  Implicitly, the judge found that Block-Davis also advised Petitioner regarding a possible defense of intervening cause and discussed on multiple occasions with him the pros and cons of going to trial as opposed to accepting a plea.  Implicitly, the judge also found that counsel had assumed, during plea negotiations, that, at trial, she believed that she could establish negligence of sufficient gravity to constitute a legal defense, but that, based on her experience and her understanding of the local community, she believed that jury nullification was a real possibility.  The ruling suggests that the Court found credible also that counsel had supplied Petitioner with a written explanation of the various possible sentences and trial outcomes and that primarily, Petitioner focused on obtaining a plea that resulted in the least amount of prison time.[5]

Under all of these circumstances, Petitioner has not met his burden of establishing that Block-Davis provided ineffective assistance to Petitioner.  As the Supreme Court has repeatedly made clear, "even under de novo review, the standard for judging counsel's representation is a most deferential one. Unlike a later reviewing court, the attorney observed the relevant proceedings, knew of materials outside the record, and interacted with the client, with opposing counsel, and with the judge. It is 'all too tempting' to 'second-guess counsel's assistance after conviction or adverse sentence.'"  Harrington

---

[5]  Respondent makes essentially the same point, though framed differently.  Respondent argues that the finding that Block-Davis told Petitioner about the autopsy report during the plea bargaining phase necessarily finds other advisements counsel made, because the only reason she had to tell Petitioner about the autopsy report was as it related to a defense of intervening cause.  (Doc. 118, p. 1).

1   v. Richter, 562 U.S. 86, 105 (2011) (quoting Strickland, 466 U.S. at 689.  The question is whether an

2   attorney's representation amounted to incompetence under "prevailing professional norms," not

3   whether it deviated from best practices or most common custom.  Id.

4          Given Strickland's deferential standard, even under de novo review, this Court will not attempt,

5   upon a more fully developed, but cold, record, and with the dubious benefit of hindsight, to second-

6   guess Block-Davis' representation of Petitioner.  Her representation was based upon her many years of

7   trial experience, her familiarity with the prevailing temperament in the surrounding community, her

8   appreciation for the extensive media exposure the case had received, her interactions with an

9   unsympathetic trial judge, as well as her face-to-face encounters, over several months, with Petitioner.

10  Indeed, this appears to be precisely the type of case which our Supreme Court has cautioned should be

11  given the full deference required by federal law.

12         Petitioner, however, makes several arguments to the contrary.  First, he argues counsel should

13  have conducted further discovery, that she should have conducted a more extensive investigation by

14  obtaining expert testimony regarding the hospital's degree of medical negligence, and by failing to do

15  so, her representation of Petitioner was somehow deficient; the Court disagrees.

16         The record establishes that Block-Davis assumed, for purposes of plea bargaining, the best-case

17  scenario for Petitioner, i.e., that she could develop expert medical testimony that would support a jury

18  finding of an intervening cause, i.e., the hospital's gross negligence, that, if so found by the jury, would

19  provide Petitioner with an absolute defense to second-degree murder.  All of her advisements to

20  Petitioner during the plea bargaining process proceeded from this basic assumption.  Thus, the fact that

21  she did not actually expend the time, money, and staff resources to develop the full evidentiary basis for

22  this defense is irrelevant; she assumed that it could be proven to a jury as a "given" in her discussions

23  with Petitioner.

24         It runs counter to logic to suggest that actually having the evidence in hand would somehow

25  have altered the substantive nature of counsel's advisements to Petitioner or would have caused

26  Petitioner himself to change his mind, forego a plea bargain, and proceed to trial, with all of the risks

27  that would entail.  Such assumptions are not based on persuasive evidence in the record and amount to

28  nothing more than speculation and conjecture. This is especially so in light of the fact that Petitioner

told Block-Davis that he did not want to put the victim's daughter through a trial and that he appeared focused on getting the best deal possible during the plea bargaining stage.

In a related argument, Petitioner argues that, by suggesting to Petitioner that the jury might "nullify" any gross negligence finding on the part of the hospital, counsel was essentially abandoning her representation of Petitioner. Again, the Court does not agree. Thhe record suggests that Block-Davis was understandably concerned about the widespread negative media coverage, the effect that coverage would have on a small community and the potential jury pool and the apparent hostility of the trial judge to any efforts by the defense to mitigate the highly unfavorable facts. Coupled with her understanding that there are no "slam dunk" defenses, there is nothing in the record that suggests that, by presenting Petitioner with the few "pros" and many "cons" of going to trial, she had "closed the door on advocating on petitioner's behalf," and had "given up trying to act as petitioner's advocate." (Doc. 115, pp. 8; 11)  Though Petitioner discusses counsel's purported lack of research and investigation, it appears that the gravamen of Petitioner's reasoning appears to be that no competent attorney would ever suggest to a client that the jury might ignore the evidence and convict him because of bias toward the victim or prejudice toward the client. To the contrary, it is counsel's responsibility, as Block-Davis clearly understood, to objectively present all possibilities and allow the defendant to make his or her own choices among them.[6]

Petitioner also suggests he established actual innocence, which is relevant, he argues, to the prejudice prong of <u>Strickland</u>. The Court does not agree. Simply put, Petitioner's actual innocence ceased to be relevant to this case when Respondent withdrew the affirmative defense of statute of limitations. Contrary to logic, currently, actual innocence is not a free-standing constitutional violation that supports habeas relief. <u>McQuiggin v. Perkins</u>, __U.S.__, 133 S.Ct. 1924, 1931 (2013) ("We have

---

[6] Petitioner cites the Court's 2006 order denying Respondent's motion to dismiss, which contained language that it appeared Block-Davis had been ineffective in failing "to represent her unpopular client with the requisite zeal expected when the victim's autopsy report precludes a factual basis for the plea ultimately negotiated." (Doc. 115, p. 12)  This conclusion, however, was made solely in the context of Respondent's motion to dismiss for untimeliness under the AEDPA and, to the extent that it went beyond the core conclusion that Petitioner was entitled to equitable tolling and to the substantive claim of ineffective assistance, it was *dicta*. Second, it was made on the very limited record available to the Court nine years ago--essentially, the "dueling" declarations of Block-Davis and Petitioner, which recount widely divergent recollections of events, and the autopsy report. Subsequently, the Court conducted an evidentiary hearing at which Block-Davis and Petitioner both testified extensively under oath and were cross-examined by opposing counsel and after which Judge Dixon made his findings. Given these circumstances, selective quotation of the Court's 2006 ruling has little relevance for today's ruling on Petitioner's substantive claims.

not resolved whether a prisoner may be entitled to habeas relief based on a freestanding claim of actual innocence"); Herrera v. Collins, 506 U.S. 390, 404-405 (1993) (discussing the difficulties of reviewing an "actual innocence" claim within the context of a habeas corpus proceeding).  Moreover, the Ninth Circuit's remand order was limited to exploring whether the actual innocence claim had been proven such that the Court could address the affirmative defense of untimeliness.  Once that defense was withdrawn, actual innocence was no longer an issue in the case.

Petitioner contends that, under Strickland, he must show that the "affirmative defense, lack of causation, would have likely succeeded at trial.  In order to establish this affirmative defense petitioner must show that the hospital's failure to properly place the feeding tube was the sole cause of death and that the hospital's treatment constituted gross negligence."  (Doc. 115, p. 16).  The Court disagrees once again.

To establish a claim of ineffective assistance, Petitioner's obligation is to show deficient performance by counsel and prejudice. If an attorney was guilty of being ineffective every time he or she asserted a claim that "would have likely succeeded at trial" but did not, either due to an adverse jury decision or because the client chose to engage in a plea bargain, the Court would be awash in Strickland claims. Just as there are many legitimate and strategic reasons why a client might forgo testifying in his own behalf in a criminal trial, there are many legitimate and strategic reasons for a client to forgo a potentially meritorious claim or defense in pursuit of a plea bargain.  It is unsupported to suggest that showing the likelihood of a defense's success at trial establishes deficient representation under Strickland.

Petitioner's "prejudice" argument under Strickland appears to be based on the erroneous assumption that no criminal defendant who is actually innocent would ever knowingly and intelligently plead guilty; hence, if Petitioner were actually innocent, then, *ipso facto*, he would not have plead guilty and prejudice would have been established.  To the contrary, there are many reasons for an actually innocent defendant to enter a guilty plea, e.g., in order to avoid a conviction that carries a longer sentence or a conviction on multiple charges that would be dismissed in a plea agreement.

Petitioner's claim of actual innocence also appears to contain a claim that, because Petitioner

1  was factually innocent, the plea was invalid because it lacked a factual basis,[7] i.e., that his conduct had

2  not actually caused the victim's death.  This contention must be rejected for several reasons.

3       First, as a standalone claim, Petitioner has never raised this issue in these proceedings and there

4  is no showing that it has been exhausted in state court.  As a result, it can only be considered in the

5  context of a claim of ineffective assistance, e.g., that counsel was ineffective for allowing Petitioner to

6  plead guilty without a correct factual basis being placed on the record.  However, as Block-Davis

7  explained at the evidentiary hearing, the trial judge rejected her request to put on the record that the

8  autopsy report had concluded that the victim's death was a direct result of the hospital's negligence.

9  The judge told Block-Davis that if she insisted on placing such information on the record, no change of

10 plea would be permitted and the matter would proceed to trial.  Thus, counsel was faced with the

11 Hobson's choice of permitting the change of plea to proceed without a record of the hospital's

12 negligence or insisting on making the record and forfeiting the plea deal.  In the latter situation,

13 Petitioner would lose the chance to enter the plea that would afford him a shorter sentence and would

14 have had to go to trial, with all of the risks that entailed.  Given Petitioner's "focus on" and stated

15 desire to resolve his case through a plea that would minimize the length of his sentence, this Court

16 cannot consider Block-Davis' actions to be incompetent.

17      Second, the issue of the hospital's gross negligence, as opposed to its simple negligence, was a

18 fact question for the jury.  As the Supreme Court pointed out in Premo v. Moore,

19      In the case of an early plea, neither the prosecution nor the defense may know with much
        certainty what course the case may take.  It follows that each side, of necessity, risks
20      consequences that may arise from contingencies or circumstances yet unperceived.  The absence
        of a developed or an extensive record and the circumstance that neither the prosecution nor the
21      defense case has been well defined create a particular risk that an after-the-fact assessment will
        run counter to the deference that must be accorded counsel's judgment and perspective when
22      the plea was negotiated, offered, and entered.

23 Premo, 562 U.S. at 126.  Petitioner presumes that the jury would have decided in his favor, based upon

24 the declarations of medical witnesses submitted as part of these proceedings.  However, as Block-Davis

25

26

27

28
---
[7] Petitioner refers to this as "insufficient evidence" in violation of the Due Process Clause.  (Doc. 115, p. 17).

noted in her testimony, the defense would have presented its experts, and the prosecution would have

counter with its own.[8]  How this would have turned out, is anyone's guess.

Even where evidence of innocence seems unassailable, the Supreme Court has held that

…[W]hile most pleas of guilty consist of both a waiver of trial and an express admission of guilt, <u>the latter element is not a constitutional requisite to the imposition of criminal penalty</u>. An individual accused of crime may voluntarily, knowingly, and understandingly consent to the imposition of a prison sentence even if he is unwilling or unable to admit his participation in the acts constituting the crime.

<u>North Carolina v. Alford</u>, 400 U.S. 25, 37 (1970)(Emphasis supplied).  Logically, if a guilty plea

entered into by a defendant who believes himself to be innocent does not offend federal constitutional

principles, then neither would a guilty plea entered solely to avoid conviction on a greater offense,

where one or more of the elements of that offense may be extremely difficult to prove at trial.[9]

In an ideal world, perhaps there would always be a one-to-one correspondence between actual,

i.e., factual, innocence and legal innocence, and individuals who were factually innocent would never

be placed in a situation where they must choose between going to trial with the risk of facing a long

sentence, on the one hand, and pleading guilty to a lesser charge and facing a much shorter sentence, on

the other.  However, here, Block-Davis advised Petitioner of a spectrum of potential plea bargains and

trial outcomes, each with their own specific sentences.  Essentially, Petitioner could plead guilty to

second degree murder and receive a sentence of fifteen-years-to-life, or he could go to trial and risk

facing a maximum of 23-years-to-life if convicted, or acquittal if the jury accepted the defense of

intervening cause.

Assuming, arguendo, that the defense could have established such a defense, the fact that Block-

Davis did not place her thumb on the scale by urging Petitioner to go to trial and risk the maximum

sentence if convicted, but instead set out the full range of possible options and outcomes available to

---

[8] The implied suggestion that because Respondent has not presented evidence on this topic that he could not have done so, is unsupported.

[9] In <u>Alford</u>, the defendant pleaded guilty in order to avoid a possible death sentence, but asserted his innocence.  On appeal, defendant raised an argument analogous to that now raised by Petitioner, i.e., that where the accused maintains his innocence, the "State should not have allowed him this choice but should have insisted on proving him guilty of murder in the first degree."  <u>Alford</u>, 400 U.S. at 37.  Rejecting this argument, the Supreme noted that while states may prohibit pleading guilty to a lesser offense to avoid a conviction at trial on a greater offense, "…this is not the mandate of the Fourteenth Amendment and the Bill of Rights.  The prohibitions against involuntary or unintelligent please should not be relaxed, but neither should an exercise in arid logic render those constitutional guarantees counterproductive and put in jeopardy the very human values they were meant to preserve."  <u>Id</u>., at 39. Petitioner has presented no persuasive argument why the Supreme Court's logic would not extend to trial counsel as well.

Petitioner and allowed him the freedom to make his own choice, is not in any way indicative of

incompetent representation, nor does it show the requisite prejudice under Strickland.

There are overarching public policy concerns that are implicated when a federal court, years

removed from the actual events, inserts its own judgment for that of the attorney representing the

accused during plea bargaining:

> . . . [I]neffective assistance claims that lack necessary foundation may bring instability to the very process the inquiry seeks to protect. Strickland allows a defendant "to escape rules of waiver and forfeiture." Richter, 562 U.S. at ___, 131 S.Ct. 770. Prosecutors must have assurance that a plea will not be undone years later because of infidelity to the requirements of AEDPA and the teachings of Strickland. The prospect that a plea deal will afterwards be unraveled when a court second-guesses counsel's decisions while failing to accord the latitude Strickland mandates or disregarding the stricture dictated by AEDPA could lead prosecutors to forgo plea bargains that would benefit defendants, a result favorable to no one.

Premo, 562 U.S. at 125.

Turning to the prejudice prong of Strickland, the Court concludes that Petitioner has failed to

establish that requirement as well. Although Petitioner testified at the evidentiary hearing that he

would not have pled guilty, but would instead have gone to trial, had he known of the availability of the

defense of intervening causation, the Court finds such testimony to be as self-serving as it is

convenient. The clear weight of evidence before the Court favors Block-Davis' recollection of events,

not Petitioner's. In that regard, defense counsel testified that Petitioner was intent on avoiding trial and

its potential risks in favor of getting the best plea bargain available. The evidence also establishes that

Petitioner wanted to reach a plea agreement even though he was aware, through counsel's advisements,

of the fact that a legal defense was available that might succeed at trial. This directly undercuts any

claim that, but for counsel's failure to advise Petitioner of an available defense, Petitioner would have

gone to trial. Accordingly, the Court concludes that Petitioner has not met Strickland's prejudice

requirement.

Regarding Petitioner's contention that Block-Davis had a conflict of interest because of threats

made against her, Petitioner has failed to establish that this claim has merit. Block-Davis's declaration

states that, in a brief verbal exchange at the courthouse, an unidentified man told her that she and her

client should die. (Doc. 45, Ex. A-1). Certainly, such a statement could be construed as a threat.

However, Block-Davis immediately notified the trial judge and she was provided with an alternative

23

and more secure entrance to the courthouse away from the public.  (Id.).  Block-Davis never saw the man again, and indicated that she viewed the encounter as one where the man was simply voicing his opinion in an uncomfortable way.  (Id.; Doc. 1, Ex. 2).

"To establish a sixth amendment violation based on a conflict of interest, a defendant must show that (1) that counsel actively represented conflicting interests, and (2) that an actual conflict of interest adversely affected his lawyer's performance."  Cuyler v. Sullivan, 446 U.S. 335, 350 (1980).  Petitioner must prove an actual conflict "through a factual showing on the record."  Morris v. California, 966 F.2d 448, 455 (9th Cir. 1992).  Petitioner must also show that the conflict likely had an adverse effect on the representation.

There is no substantive evidence in the of a conflict of interest nor do the facts reasonably create an inference of such a conflict.  Petitioner's reasoning appears to be that counsel was intimidated by this threat and thereafter attempted to steer Petitioner into a plea agreement, thereby avoiding the necessity of a trial and further public enmity.  Nothing in the record, however, apart from Petitioner's self-serving speculation, supports such a finding.  As discussed previously, counsel competently represented Petitioner, presented him with all possible options regarding both a plea and trial outcomes, and thoroughly discussed potential defenses with him.  None of that suggests that her interests and those of her client diverged, let alone were in conflict, or that counsel placed her concern for her own safety above the legal interests of her client.

Finally, the record contains no proof that counsel pressured Petitioner into pleading guilty such that his plea was involuntary.  Even a cursory review of the change of plea hearing contradicts such a view.  At that hearing Petitioner admitted that he was pleading guilty voluntarily.  (Lodged Document ("LD") 3, pp. 4; 14).  At the conclusion, the trial judge found Petitioner had entered into his plead voluntarily.  (Id., p. 16).   A petitioner's representations and the trial court's findings at a change of plea hearing "constitute a formidable barrier in any subsequent collateral proceedings."  Blackledge v. Allison, 431 U.S. 63, 73-74 (1977).  Petitioner's "[s]olemn declarations in open court carry a strong presumption of verity."  Id. at 74.  In the absence of any real evidence of a conflict of interest, the Court rejects this aspect of Petitioner's ineffective assistance claim.

In sum, Petitioner has failed to establish either deficient performance by Block-Davis nor any

24

1  prejudice deriving therefrom.  Accordingly, the Court rejects Petitioner's claim of ineffective assistance

2  of trial counsel.

3  **B.    Failure To Conduct An Inquiry Into Purported Conflicts Of Interest**

4  Petitioner next contends that the trial court erred in failing to conduct an inquiry into defense

5  counsel's purported conflicts of interest.  This claim was raised in Petitioner's habeas petition in the

6  Superior Court as well as the state appellate courts.  However, the Superior Court, though noting the

7  claim, did not address it in its decision.  (LD 2, Ex. C).

8  When a state court decision on a petitioner's claims rejects some claims but does not expressly

9  address a federal claim, a federal habeas court must presume, subject to rebuttal, that the federal claim

10  was adjudicated on the merits. Johnson v. Williams, —— U.S. ——, ——, 133 S.Ct. 1088, 1091 (2013).

11  Moreover, where the state court reaches a decision on the merits but provides no reasoning to support

12  its conclusion, a federal habeas court independently reviews the record to determine whether habeas

13  corpus relief is available under § 2254(d). Stanley v. Cullen, 633 F.3d 852, 860 (9th Cir. 2011); Himes

14  v. Thompson, 336 F.3d 848, 853 (9th Cir.2003); Greene v. Lambert, 288 F.3d 1081, 1089 (9th

15  Cir.2002) (holding that when there is an adjudication on the merits but no reason for the decision, the

16  court must review the complete record to determine whether resolution of the case constitutes an

17  unreasonable application of clearly established federal law); Delgado v. Lewis, 223 F.3d 976, 982 (9th

18  Cir. 2000) ("Federal habeas review is not de novo when the state court does not supply reasoning for its

19  decision, but an independent review of the record is required to determine whether the state court

20  clearly erred in its application of controlling federal law.").  "[A]lthough we independently review the

21  record, we still defer to the state court's ultimate decisions." Pirtle v. Morgan, 313 F.3d 1160, 1167 (9th

22  Cir. 2002).  "Independent review of the record is not de novo review of the constitutional issue, but

23  rather, the only method by which we can determine whether a silent state court decision is objectively

24  unreasonable." Himes, 336 F.3d at 853. Where no reasoned decision is available, the habeas petitioner

25  still has the burden of "showing there was no reasonable basis for the state court to deny relief."

26  Harrington, 131 S.Ct. at 784.  Accordingly, the Court will review the claim independently.

27  As Respondent notes, the U.S. Supreme Court has held that a reversal of conviction is required

28  when a trial court fails to inquire into conflicts when the judge knows or reasonably should know that a

25

particular conflict exists.  Wood v. Georgia, 450 U.S. 261, 271-272 (1981).  As discussed above, however, the Court has concluded that no conflict was established in the trial court; rather, defense counsel indicated simply that a stranger had made a threat, a situation that the trial court addressed immediately and to the apparent satisfaction of trial counsel.  Petitioner's argument vis-à-vis a conflict between him and his attorney is premised entirely upon his speculation that counsel was intimidated by the threat to such a degree that she placed her own safety concerns above representing Petitioner.  An independent review of the record does not disclose any evidence to support such a hypothesis.  Therefore, it cannot follow that the trial court knew or reasonably should have known of a conflict that required further inquiry.  Hence, the claim lacks merit and must be rejected.

### C.      Restitution Order

Finally, Petitioner argues that the trial court erred in imposing a restitution fine.  Again, this contention lacks merit.   As with the previous claim, this issue was presented to the Superior Court but was not addressed by that court in the written decision denying the petition.  Accordingly, the Court will review the claim independently.

This claim lacks merit for two fundamental jurisdictional reasons—failure to raise a federal constitutional claim and failure to raise a claim that satisfies the "in custody" requirement of federal habeas law.   As mentioned previously, issues of state law are not cognizable on federal habeas review.  Estelle v. McGuire, 502 U.S. 62, 67 (1991)("We have stated many times that 'federal habeas corpus relief does not lie for errors of state law.'"), *quoting* Lewis v. Jeffers, 497 U.S. 764, 780 (1990); Gilmore v. Taylor, 508 U.S. 333, 348-349 (1993)(O'Connor, J., concurring)("mere error of state law, one that does not rise to the level of a constitutional violation, may not be corrected on federal habeas").   Moreover, where, as here, the state courts have determined the state law question, this Court is bound by that interpretation.  Hicks v. Feiock, 485 U.S. 624, 629 (1988), unless the interpretation is an "obvious subterfuge to evade consideration of a federal issue." Mullaney v. Wilbur, 421 U.S. 684, 691 n. 11 (1975); Lewis v. Jeffers, 497 U.S. 764, 780 (1990) (federal habeas court must respect a state court's application of its own law and must not engage in de novo review).  A federal court has no basis for disputing a state's interpretation of its own law. Clemons v. Mississippi, 494 U.S. 738, 739–740 (1990).

Second, a claim regarding a state court restitution order fails to implicate the "in custody" requirement of the AEDPA. Pursuant to 28 U.S.C. § 2254(a), "[t]he Supreme Court, a Justice thereof, a circuit judge, or a district court shall entertain an application for a writ of habeas corpus in behalf of a person *in* custody *pursuant to the judgment of a State court* only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." (Emphasis supplied). The "in custody" requirement is jurisdiction for a federal habeas court. Baily v. Hill, 599 F.3d 976, 978 (9th Cir. 2010). In Baily, the Ninth Circuit observed that the "in custody" requirement of federal habeas law has two aspects. First, the petitioner must be "under the conviction or sentence under attack at the time his petition is filed." Baily, 599 F.3d at 978-979, *quoting* Resendiz v. Kovensky, 416 F.3d 952, 956 (9th Cir. 2005). For this aspect of "in custody," actual physical custody is not indispensable to confer jurisdiction; rather, the court will have habeas jurisdiction if a sufficient "restraint on liberty," as opposed to a mere "collateral consequence of a conviction," exists. Id. at 979. In this case, because Petitioner was in physical custody of Respondent at the time he filed the instant petition, and has remained in the physical custody of Respondent throughout these proceedings, this first aspect of the "in custody" requirement is not at issue.

The second aspect of "in custody," however, is fatal to Petitioner's habeas claim:

> The plain meaning of the test of § 2254(a) makes clear that physical custody alone is insufficient to confer jurisdiction. Section 2254(a)'s language permitting a habeas petition to be entertained 'only on the ground that [the petition] is in custody in violation of the Constitution or laws or treaties of the United States," explicitly requires a nexus between the petitioner's claim and the unlawful nature of the custody.
>
> Giving the crucial statutory phrase within § 2254(a) its ordinary, natural meaning, we cannot but conclude that to sustain his habeas challenge, [petitioner] must show that his custody in itself, or its conditions, offends federal law. It is not enough for [petitioner] to say, in substance, my custody is okay and consistent with federal law, but I should not be burdened by this restitution requirement. What [petitioner] is required to pay in restitution is not by ordinary meaning a part of his custody.

Baily, 599 F.3d at 980. (Citations omitted)(emphasis supplied). In Baily, the petitioner, as is the case here, has challenged only his restitution fine. After the above discussion, the Ninth Circuit flatly rejected habeas jurisdiction under such circumstances:

> [Petitioner's] challenge to the restitution order lacks any nexus, as required by the plain test of § 2254(a), to his custody. While [petitioner's] liberty has been severely restrained by his conviction and custodial sentence, the remedy that [petitioner] seeks, the elimination or alteration of a money judgment, does not directly impact–and is not directed at the source of

27

the restraint on–his liberty. If successful, [petitioner] could reduce his liability for restitution but would still have to serve the rest of his custodial sentence in the same manner; his remedy would affect only the fact or quantity of the restitution that he has to pay to the victim. [Petitioner's] argument is only that he has been ordered to pay restitution "in violation of the Constitution or laws or treaties of the United States," 28 U.S.C. § 2254(a), and not that his custody is unlawful. That he is in physical custody while attacking the restitution order is insufficient to confer jurisdiction over his habeas petition.

Baily, 599 F.3d at 981. Here, the restitution claim does not implicate Petitioner's conviction or sentence in any way and, therefore, does not satisfy the "in custody" requirement for federal habeas review.

## IV.    Conclusion

Because Petitioner has failed to establish that he is entitled to habeas relief as to any of his claims, the Court will deny the petition with prejudice.

Moreover, the Court declines to issue a certificate of appealability. A state prisoner seeking a writ of habeas corpus has no absolute entitlement to appeal a district court's denial of his petition, and an appeal is only allowed in certain circumstances. Miller-El v. Cockrell, 537 U.S. 322, 335-336 (2003). The controlling statute in determining whether to issue a certificate of appealability is 28 U.S.C. § 2253, which provides as follows:

> (a) In a habeas corpus proceeding or a proceeding under section 2255 before a district judge, the final order shall be subject to review, on appeal, by the court of appeals for the circuit in which the proceeding is held.
>
> (b) There shall be no right of appeal from a final order in a proceeding to test the validity of a warrant to remove to another district or place for commitment or trial a person charged with a criminal offense against the United States, or to test the validity of such person's detention pending removal proceedings.
>
> (c)(1) Unless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken to the court of appeals from—
>
> > (A) the final order in a habeas corpus proceeding in which the detention complained of arises out of process issued by a State court; or
> >
> > (B) the final order in a proceeding under section 2255.
>
> (2) A certificate of appealability may issue under paragraph (1) only if the applicant has made a substantial showing of the denial of a constitutional right.
>
> (3) The certificate of appealability under paragraph (1) shall indicate which specific issue or issues satisfy the showing required by paragraph (2).

If a court denied a petitioner's petition, the court may only issue a certificate of appealability when a petitioner makes a substantial showing of the denial of a constitutional right. 28 U.S.C. §

2253(c)(2).  To make a substantial showing, the petitioner must establish that "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were 'adequate to deserve encouragement to proceed further'." Slack v. McDaniel, 529 U.S. 473, 484 (2000) (*quoting* Barefoot v. Estelle, 463 U.S. 880, 893 (1983)).

In the present case, the Court finds that Petitioner has not made the required substantial showing of the denial of a constitutional right to justify the issuance of a certificate of appealability. Reasonable jurists would not find the Court's determination that Petitioner is not entitled to federal habeas corpus relief debatable, wrong, or deserving of encouragement to proceed further.  Thus, the Court DECLINES to issue a certificate of appealability.

## ORDER

For the foregoing reasons, the Court **ORDERS**:

1. The petition for writ of habeas corpus (Doc. 1), is **DENIED** with prejudice;

2. The Clerk of the Court is DIRECTED to enter judgment and close the file;

3. The Court DECLINES to issue a certificate of appealability.

IT IS SO ORDERED.

Dated:   **December 15, 2015**          **/s/ Jennifer L. Thurston**
                                              UNITED STATES MAGISTRATE JUDGE